April 18, 2015  Bob Atkins Mr. Kirk! For the government. Is government the appellate today in to the criminal case? Yes. Yes. Good morning. May it please the court, counsel, Jane Kirk, on behalf of the government. I hope to reserve six minutes for rebuttal. That's fine. This case is about whether the Contraband Cigarette Trafficking Act, the CCTA, abrogates a treaty right to travel found in the Yakima Treaty of 1855. I'd like to emphasize three points this morning. The first one is that the CCTA is a commerce issue, and the treaty-righted issue is a travel issue, and the two are not in — do not meet. They're separate issues, that the commerce issue does not impact the treaty travel issue. The second point I'd like to make is that if this Court were to find that the commerce issue does impact the treaty issue, that commerce issue does not abrogate the treaty issue, and therefore the CCTA still should stand. And third, that the minimum burden analysis is the correct analysis for this case. In June of 2004, the defendant was found in the state of Washington on the Yakima Reservation in possession of unstamped and unreported cigarettes. The defendants, Cato and Harry Smishkin, did not even own the cigarettes. The cigarettes were not even owned by the Yakima tribe or by the Smishkins. They were owned by retailers in the Western District of Washington. The defendants were simply acting as couriers, transporting the cigarettes from Idaho, ultimately, to the Western District of Washington. Could you just answer this question? What types of activity related to trade, if any, does the right to travel protect? I don't believe it does. Because the treaty — None. Is that your answer? Yes, Your Honor. Because? Because the treaty right refers to travel. It does not refer to trade. There's no language in the treaty at all that refers to trade or that you would get trade out of the language. The language is the free use — the use of public highways. That was the treaty right. How about travel for the purposes of trade? That is — that language is not in the treaty. But that's the way it's been interpreted, though. Yes. In our case law. Right. But that just — that describes the travel. It does not say anything about the trade. Indeed. What was the purpose of the treaty? The purpose of the treaty was to permit the Yakamas to travel outside of the reservation. There were many treaties that did not permit the participants in the treaty to travel outside of the reservation. Because they had traveled for the purpose of trade in the past. Well, trade and they had traveled for social purposes. They had traveled for any number of reasons. Religious purposes. Religious purposes. No, I'm sorry. Yes. Yes. They had traveled for any number of reasons. But for the analysis, you look to the treaty first. And is there an ambiguous term? So is there an ambiguous term referring to trade in the treaty? There isn't. The only term in the treaty is travel. And that's what the treaty was reserving. Also, the treaty was only reserving the right to carry tribal goods. And I look to the Yakama Indian Nation versus Flores or Cree. It's also been referred to, Cree II, Judge McDonald's opinion. And in his conclusions of law, in his first conclusions of law, he states that the treaty right is to reserve to the tribe the right to carry tribal goods on the highway, the use of the highways. And also, if you look to the findings of fact by Judge McDonald, the first two findings of fact, he finds that individual Indians have never been exempted from the regulations imposed by the state in that case. And in that case, that was where tribal timber was being carried off the reservation to lumber mills. And the state was stopping that travel by issuing citations. So there, the treaty right was impacted. The travel was added. So is it the government's position that the treaty right only protects Indians who are in the process of travel? They can only invoke it if they're in the mode of traveling. Is that what the government is arguing? I think I am. I think you are. You're not sure? I'm trying to figure that out. Well, you've thought about this for a lot longer and a lot harder than I have. I've only seen this case for about six weeks. Yes. I'm just curious. I mean, is that the government's position, that in order to invoke the treaty right, they have to be in the mode? They have to be traveling? Yes. Yes. That travel has to be within the terms. It has to be within what's being asserted. So the fact that they have been traveling and then come to rest and they're stopped there, they're no longer traveling? Is that? They're no, in some cases they would be no longer traveling, and in a companion case they were no longer traveling, and that's what Judge Whaley found. But in this case, I would have to say that they were still traveling because the goods were on their way. They belonged to the Western District and they were on their way. So they had just stopped for a temporary respite. For several reasons that are facts that go beyond what's necessary for this appeal. Right. We don't need to think. They're resting along the way, along the highway. Well, they were changing because they saw that they were being followed. All right. All right. No need to get into details. Okay. So it's my position that they're traveling. So they were in travel then here? Pardon? They were in travel. Yes, they were in travel. This was not their final resting space. Okay. But it would appear that the treaty right might just apply. But, well, we just disagree because I think that it's a commerce issue and not a travel issue here. Is it a taxing issue? Yes. Yes. Yes, it is a taxing issue. Could you point to me that portion of the treaty which confines travel for the purpose of trading in Indian goods? Yes. All right. What portion of the treaty confines the purpose of travel for the transportation of goods as between tribes and Indian goods? Your Honor, the treaty doesn't. The treaty only says travel. And it's Judge McDonnell's interpretation and Judge McDonnell's conclusion of law. In his first conclusion of law, he says it's for the purpose of carrying tribal goods. But it is not in the treaty. It is not in the treaty. Thank you. And then in his first two findings of facts, he says individual Indians have never been exempted from the regulations at issue in Flores, in Crees v. Flores. So these, because these were not tribal goods, the Smithsons could not look to the treaty for that right. If this Court were to find that the treaty right was impacted by the CCTA, the treaty right was not abrogated. And that is the standard. I turned the Court's attention to Donovan v. Coeur d'Alene Tribal Farms, where they set out that federal law, general law applicability applies to Indians unless there are three circumstances where it does not. And the first circumstance is when it's basically a sovereign immunity. If it's touched on the right of tribal governance, then the treaty right, then the federal law gives way. Or if the law abrogates a treaty right. In Flores, the treaty right was clearly abrogated. They were traveling. The State of Washington stopped that travel by issuing citations, by stopping the truck. Here, all that has to be done is that the defendants make sure they have legal goods in their possession. They didn't even have to notify the State of Washington. As long as someone notified the State of Washington that those unstamped cigarettes were going to come into Washington, then those goods would have been legal. That doesn't impact that. Maybe it impinges on the travel right, but it does not abrogate the travel right. And I would have to believe that the Ninth Circuit, when it was choosing that language, chose that verb for a reason, that the treaty right has to be abrogated before the federal law will fall away. And third. I guess they're saying you can travel all you want, just don't bring in untaxed cigarettes. Correct, Your Honor. And that's what we want notice of. Yes. Yes. Just legal goods. Just make sure what you're picking up is legal. That's all you have to do, and then you can travel wherever, whenever you want. That's a different argument than minimal burden. Yes, it is a different argument than minimal burden, which leads me to minimal burden, Your Honor. And I believe that the minimal burden analysis does apply. And I turn to the Baker case. Very well-written opinion. Excellently written opinion. I quote from it in my sleep, Your Honor. That's right. You have been thinking about this case for a long time. I have to admit, sir, Your Honor, that the minimal burden analysis applies because Moe and Caldwell dealt with treaty rights. And in this case, and the Supreme Court has clearly held that a pre-notification is a permissible minimal burden. Miller-Milhelm is the Supreme Court case that says we can find that if the State requiring pre-notification is a permissible minimal burden. So if it's a permissible minimal burden, it could not abrogate a treaty right. It's simply a minimal burden. Is there something about this case that, when you speak of minimal burden, and yet a harsh criminal penalty as opposed to a fine is imposed for failure to make the notification, how does that affect this case, if at all? Hmm. Let's see. I don't think we go there. I think that that's... Because? Because Moe and Caldwell did not go there. Moe and Caldwell did not address whether or not the penalty was too harsh for the burden. It doesn't affect the evaluation of the burden? I don't believe it does. All right. Thank you. Thank you. So if there are no other questions, I'll reserve the rest for rebuttal, please. Thank you. Thank you. May it please the Court. My name is Rebecca Pinnell. I represent Cato Smitskin, who is in the courtroom today in the front row, along with his father, Harry Smitskin. Russ Mazzola is here on behalf of Harry Smitskin, and Sharon Hainsley is here on behalf of the Yakama Indian Reservation. I would like to take ten minutes, and then the remaining five minutes will be split between Mr. Mazzola and Ms. Hainsley. That's fine. The CCTA is a law of general applicability, and so it will apply unless there is an exception to a law of general applicability. And in this case, the exception is a tribal treaty right. So there's really two issues I think that the Court needs to focus on in determining whether a tribal treaty right bars application of the CCTA in this case. Number one, does the treaty right apply? And number two, do exceptions to the treaty apply in this case? And it's important to understand the unique way in which treaties protect the rights of Indians. And I think Judge Nelson's point was very important. Judge Nelson asked Ms. Kirk, where in the treaty is the right to travel not extended or confined to travel for purposes of only transporting tribal goods? And it's not mentioned in the treaty. And because it's not mentioned, that fact resolves in favor of the Indians, not in favor of the government, because treaties preserved preexisting rights. The treaties weren't the grant of rights from the Federal Government to the Indian tribes. The Indian tribes, before the treaties existed, were allowed to travel wherever they wanted with whatever kinds of goods they wanted. And at the time of the treaty, if the travel right was preserved by the treaty, the travel right is as broad as anything the Indians could have done at the time of the treaty unless specifically restricted by the treaty. And in this case, the only restriction on the right to travel is that it has to be in common with others. And the in common with language has been interpreted both by the Supreme Court in the fishing context as well as this Court and Judge McDonald in the specific travel context of the Yakama Treaty of 1855. So the question is, would Chief Kamiakin have thought at the time of the treaty that he could have gone to the area of Idaho or the area of Montana and picked up goods and taken them to the Puget Sound? Clearly, based on all the factual findings that Judge McDonald went through in his decision, that was a common practice of the Yakamas. The Yakamas were inveterate traders. I think what you're arguing now is that the treaty itself, even if there were a law which would require notice or would otherwise impact, it would be invalid because it would violate the treaty because travel means or includes trade. Travel for whatever purpose unless limited by the treaty. And the treaty provided no limitation on the right to travel, so any purpose is protected. And Judge McDonald specifically found that trade was a very important purpose. This case is not a commerce case. The Smithskins were not involved in selling cigarettes. We are not saying that a person, a tribal member, can sell cigarettes without complying with Washington State's tax rules. This is just a travel case, not a case involving nonpayment of taxes to the State of Washington. Could I ask, if the activities of the paid couriers could suit as trade, how do you distinguish that excellent opinion in U.S. v. Baker? Well, in Baker, Judge Thompson assumed for purposes of argument that there was a treaty right to trade. And the Court wrote that this law doesn't impinge on that right to trade. It only requires that if the Indian profits from the trade, that a certain amount of profits have to be paid in the form of a tax. And, of course, that payment occurs only if the trade is successful and afterwards, whereas the restrictions in this case require a tribal member to engage in certain activities before they can even travel. Before an Indian can even go and travel to pick up goods or what have you, they have to either pre-notify the State of Washington or pay a tax, very similar to what the Supreme Court found unconstitutional in Tooley. Before Tooley could go and fish, he had to get a license and pay a tax under Washington State law. And because that occurred before he could even go do it, that impinged on his treaty right. And the Supreme Court said that it may even seem fair or a good idea that the State would say that you need to get this sort of license. But because the treaty protects that right, the treaty is impinged by the State of Washington's requirement that a license and a licensing fee be paid. So then the second argument is, well, if the treaty right applies, is this law nevertheless enforceable in light of a treaty? Well, it can be enforceable if Congress intended that the treaty be abrogated. But I think Judge Thompson's decision in Baker makes clear that there was no specific intent with respect to the Indian tribes. The CCTA was primarily aimed at bootlegging and organized crime. It was not specifically aimed towards the Indians or not aimed at the Indians.  The only way in which, if abrogation doesn't occur, that a treaty right can be impinged upon is if there is a regulatory purpose. And a regulatory purpose, similar to the free speech context, is a time, place, and manner restriction. This is where the government's arguments about legal goods come in versus illegal goods. To just say, well, these were illegal goods, is to conflate the regulatory analysis. Why are these illegal goods? The vast majority of goods that are illegal are illegal for proper regulatory purposes. Drugs, agricultural goods, things that might impair the ability of others to use the roads in common with the Yakama Nations are illegal for proper time, place, and manner public good purposes. In this case, there's been no allegation that there's any reason for the pre-notification requirement except for to help the state of Washington track its finances. And then for the first time in the government's reply brief, the government also said it's also to help other businesses have an equal playing field. But that's also an economic interest, an interest in helping non-Indians make money rather than preserving the public good. Those aren't the types of proper time, place, and manner restrictions that are a regulation of a treaty. The minimal burden analysis is in some ways a red herring. You only get to minimal burdens if a law is proper in the first place. The Colville decision, the Moe decision, the Milhelm decision all talk about the fact that once a tax is valid, then you can require a tribe to engage in certain minimal burdens to help the state collect its tax. But a tax isn't valid because it's only a minimal burden. And in this case, the requirement doesn't meet the regulatory purpose analysis. And so you don't get to a minimal burden sort of weighing. There's never been a minimal burden weighing in any case I've ever read that has to do with a treaty claim as opposed to a sovereignty claim. And those types of claims are very different. Sovereignty claims off reservation are not very strong, which is not to say that sovereignty isn't important. Sovereignty claims are strongest on the reservation. When tribal members travel off the reservation, they pretty much look solely to their treaty. And the difference between the analysis of a sovereignty claim and a treaty claim is apparent when you compare the Colville case with the Cree versus Waterbury case. Both of those cases discussed vehicle excise taxes. In the Colville case, the Supreme Court struck down a vehicle excise tax based solely on a sovereignty analysis. The Supreme Court said that the tax was invalid because it taxed Indians both for on-reservation use of their vehicles and off-reservation use of their vehicles. And Indian tribes, as a matter of sovereignty, are free from state taxation against tribal members on the reservation. So the tax was invalid, but not in total. The Supreme Court suggested that if there was a pro rating, it would be okay. Then in Cree versus Waterbury, Judge McDonald also addressed both primarily the treaty argument but the sovereignty argument. And the treaty argument invalidated the tax in total. There wasn't this sort of weighing of, well, on the Indian reservation, the tribe's interests in governing itself are stronger, but off the reservation not. The treaty right applies regardless. And it doesn't matter that the government may say, well, this isn't that much of a burden on the treaty right. It may impinge, but not that much. And truly, as I stated earlier, the Supreme Court said that although a license requirement, although a fee requirement may seem not considering the treaty fair and a good idea if it interferes with the treaty, it has to be struck down. The State of Washington surely has other alternatives for enforcing its tax laws, and I will leave it to counsel for the tribe to discuss those alternatives. Thank you. May it please the Court, good morning. My name is Sharon Hainsley. I'm an attorney representing Amicus Yakima Indian Nation in support of defendants' appellees in this case. The Yakima Nation urges this Court to uphold the district court's well-reasoned opinion. The district court very carefully walked through the legal analysis of whether to apply a federal law of general applicability to Indians, and then asking whether any one of the three exceptions apply. And here, in this case, unlike many other cases, including the Court's very well-reasoned opinion in Baker Yeah, well, if I had a chance to write that again, it might not be exactly the same. There was a treaty right here, and it was a fairly specific treaty right, unlike many of the other cases, Ferris or Baker, where there were more general treaty rights to a tribe's exclusive use of a reservation. In this case, the Court was absolutely right in looking to the Flores case and examining the treaty right to travel. The district court correctly decided that it infringes on the treaty right to travel for purposes of trade to require Yakima members to call the state in advance of setting foot or vehicle on the public roads for purposes of trade or risk criminal prosecution. That is the reason the Yakima Nation is present today, because that just went too far. It's important for the Court to understand the context to the nation in which the treaty was negotiated. The Yakima Nation gave up so much in return for what it received. The Yakima Nation gave up more than 10 million acres of lands that it occupied in return for having to move on to a piece of land that was about a tenth of that size. The nation also agreed that the United States could build roads all over the reservation. In return, the tribe asked that it be able to reserve its unrestricted, unconditioned they didn't use those words back in 1855, but their right to use the public roads to engage in commerce. When I say commerce, I mean trade. The treaty didn't say to engage in commerce. Did it or did it? The treaty did not say to engage in commerce. The treaty said to freely use the roads. And in the Flores opinion, which is a... So I guess what you do, you say, well, what were the Indians using the roads for? If the travel was used at that time for the purpose of trade, it must have included for the purpose of trade. Is that your argument? Exactly, Your Honor. In Flores, the record that the district court developed on a remand was extensive, and historians testified, and original documents were examined. And it was so clear in the findings of fact that the tribal members were traveling extensively, carrying all kinds of goods. They were carrying shellfish. Those weren't tribal goods. I challenge anyone to find shellfish on the Yakama Indian Reservation. They were carting shellfish back and forth. They were carting goods that were purchased from the whites, shells, beads, other things that were not manufactured on the reservation. It was a broad right. The Indians understood that they were reserving their existing broad right to travel. And if the state... And your argument would be there could be no burden on that right, minimal or not. Absolutely not. That is not how the tribe looks at it. There are times where state regulation is appropriate. This is not one of those times. But there is appropriate state regulation of the right to travel. If a tribal member is carrying something that is dangerous, hazardous waste, or if a tribal member is driving a truck that is too large... Who gets to make that decision whether you can burden it for those regulatory purposes? Is that what the burden? Is that what permits the burden? That's what permits the burden. A legitimate state reason other than obtaining, generating state tax revenues, which in this case the tribe does not believe rises to that level. In fact, no court has held that that can impinge upon a treaty. But if the state were to regulate for these other reasons, public health, safety, welfare, in the fishing cases the courts have defined conservation as a legitimate state purpose in regulating treaty fishing rights. Hopefully the tribe, the nation, and the state don't have to go to litigation every time. That's what compacts are for. And the tribe, the Yakama Indian Nation, frequently engages in agreements with the state, with other local jurisdictions. And sometimes those agreements will place burdens on the treaty right. But in that case, it's by agreement. And the tribe has a government-to-government negotiation, which is really what should happen in this case. If the state of Washington believes that there is a problem in the tax-generating collection system, then the Yakama Nation and the state should sit down and negotiate a way to close that gap. It's also important for this Court to understand. Well, I only have 13 seconds left, and I don't want to cut into Mr. Mazzola's testimony. Can I? Go ahead. Okay. The United States' position is astounding in this case. The reason being that the United States is urging this Court adopt a strict start with a strict construction of the treaty. The Ramsey case decided by this Court and other cases like it make clear that that is only appropriate if you have a Federal taxation statute and you're trying to decide if that applies to Indians. Then you start with strict construction. But in all of the cases, the Donovan cases, you do not start there. You ask, okay, you've got this general Federal law, and does it meet one of the three exceptions? Is there a treaty? And in that, is there a treaty that's being abrogated? That's where we are here. In that case, you do not engage in strict construction. You apply the traditional, longstanding Indian law canons of construction. What did the Indians understand at the time? The last thing I would like to end with, and I turn the time over to Mr. Mazzolla, is that there is no Pandora's box here. There was transit. There was travel of goods. The only reason these goods were labeled contraband is because the State wanted to keep track of them for purposes of generating taxes. The Nation is not saying that there is not an appropriate time and place for regulation of treaty rights, but this is not that time. Thank you very much. Mazzolla. Good morning, Your Honor. Your Honors, my name is Russ Mazzolla. I'm the attorney for Harry Smiskin, and I'm in the inevitable position of following two competent counsel. And I don't want to speak just for the purpose of speaking, and so I'd like to at least probably address four points. The first one, Your Honor, with respect to the government's position that the treaty only applied for travel. In Judge Shea's opinion, his initial order dismissing, he quoted from this Court's opinion in Cree, travel was of great importance to the Acomas, that they enjoyed free access to travel routes for trade and other purposes at treaty time, and that they understood the treaty to grant them valuable rights that would permit them to continue in their ways. Your Honors, I don't believe it's any question that the Court and this Court, in interpreting the decisions that affect the treaty, clearly find that the treaty involved trade, that the purpose of travel was for purposes of trade. In fact, there's and our brief addresses this issue when counsel indicates that Judge McDonald's order was restrictive, that order was originally, his order on summary judgment was originally overturned by this Court. The second order was much more expansive, the order entered by Judge McDonald, and it indicated in that order that the Acomas traveled for purposes of social, economic, and trade purposes. So that in the Court, this Court, in making its decisions, we'd ask that the Court understand the breadth of the purpose of travel. The second argument, Your Honor, is with respect to the issue of minimal burden. It's our position that we believe that the standard of minimal burden only applies in those instances when we're dealing with issues of sovereignty, not issues of treaty rights. And the Tooley case, I believe, clearly sets out the distinction between the two, that minimum burden is an acceptable way of eroding rights, if I may use that expression, when we're dealing with sovereign rights, but not when we're dealing with treaty rights. And the last point, Your Honor, is the law of lenity. In this particular case, even if this Court finds that there is ambiguity, we ask that that ambiguity be resolved, and the benefit for the Smithskins in this particular case, both Harry Smithskin and his son Cato. We believe, and I think this is the issue Your Honor addressed, about the seriousness of the charges here. This is a felony. The penalty is five years of imprisonment. Should that be a particular factor? In one way, no. On the other hand, yes. There is other ways to address this issue. That is, the right to travel. And if, in their effect, it's a violation, there would be more appropriate remedies than enforcing a violation by virtue of a felony. Thank you. Thank you. Your Honors, in this case, the defendants were simple couriers. They were not carrying tribal goods. They were not even carrying their own goods. So what was the intent of the treaty at the time that it was negotiated? I cannot believe you. They were probably going to get paid for this, I guess. They were probably going to get paid for their courier work. Yes, they were being paid. That would be economic purpose, I guess, of the travel. Right. That would be an economic purpose. But that wasn't what the tribe bargained for. The tribe bargained in the treaty for the right to carry tribal goods. It did not bargain to have courier rights. And where do you get that, that the travel right was restricted to you could carry tribal goods, but that's all? I get that from Judge McDonald's opinion in Yakima Nation v. Cree. In his conclusions of law, his very first conclusion of law says that they have the right to travel on use of the public highways without the payment of fees when carrying tribal goods. Then in his first two findings of facts, he says that individual Indians, the individual members of Yakima Nation, have never been exempted from those regulations. Well, if the tribe owned cigarettes, then McDonald's opinion we would affirm, right? Then you would go on, then you would say, yes, that if the tribe owned the cigarettes, then you would say the travel was related to a tribal activity, but then you would go on to see if these laws abrogate that treaty right. It wouldn't automatically say, okay, these are tribal goods, and therefore you can do whatever you want. The law has to abrogate that right for it to be overcome. Did I get that across? I guess I didn't follow that argument. Okay. I thought to abrogate a right, the treaty had to be very specific about that. The treaty mentioned nothing here, and in Cree, the judge said that trade was an important component of the Yakima treaty right to travel. What is your response? When he was talking in the general opinion, he was talking about the right to travel being important, that the trade being important, also religious rights, that travel was implicated in many activities, and that's why it was important for the Yakimas to be able to go off the reservation. But then in his conclusions of law, he has five of them. In the conclusion of law, he specifically says that the travel that is protected is when they're carrying tribal goods. That's in the very first conclusion of law of Judge McDonald's opinion. And the very first two findings of facts in Judge McDonald's opinion, he says that individual Indians are not exempt from these regulations. Yes, but he pointed to no specific part of the treaty that supported his conclusion. Is that correct? That's right. But he was interpreting simply the travel provision. The treaty only mentions travel. That's the only word it uses. And then he found that the travel was the use of the public highways. So in Cree, it made sense because the use of the public highways, what was being stopped by the state, were the vehicles. That's the travel. The use of the public highways was being stopped, was being abrogated. In this case, it's not an abrogation of that travel right because it's just travel. This is commerce. Now I'm repeating myself. Sorry about that. But I understand your opinion. And so the language has to be ambiguous before you interpret it. And Judge McDonald found it ambiguous as to carrying tribal goods. But the language is not ambiguous. It doesn't mention about courier rights. It doesn't say that they're going to be able to set up and carry things all over the United States. It's when you're carrying tribal goods. And when the defendants appointed to nothing in the treaty or in the minutes, that would indicate that the tribe was trying to reserve the right to be couriers. There's nothing in the minutes that say that they didn't have an ownership, that the tribe didn't have an ownership in the goods going back and forth. Oh, this is what I wanted to make when I got to it. That at the time that this was negotiated, the Indians would have understood that they could only carry legal goods and that goods would be regulated. They surely understood at that time that they couldn't carry anything they wanted, that there were certain restrictions. And so it's not improbable to say, and I think it's only logical to say, that they would have understood at the time that there could be future restrictions on what they could carry, because there were restrictions at that time. I can't believe that there weren't restrictions. I was going to say, what restrictions existed at that time? Well, I would think... You're not sure. I'm not sure, but they had to carry explosives or something. There were restrictions, and so logically you would think that there would be restrictions. They wouldn't be thinking that, oh, this gives us carte blanche to carry whatever we want whenever we want. Your Honors, I would just say in conclusion that this has been the pre-notification that the defendants didn't even have to make, by the way, that just someone had to make. That the pre-notification has been determined to be a minimal burden, and that minimal burden could not abrogate a right. It's... Okay. It maybe impinges. And I would turn to the language in Baker that talks about impinging treaty rights as permissible. Thank you. Thank you very much. We appreciate the arguments in this case. They're very helpful.
judges: D.W. Nelson, Thompson, Paez